COPY

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

District of Nebraska

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | **SEALED** |
| Ketankumar Babubhai Chaudhari, a/k/a Ken Chaudhari (001), Rashmi Ajit Samani, a/k/a Falguni Samani (002), Amit Prahladbhai Chaudhari, a/k/a Amit (003), Amit Babubhai Chaudhari a/k/a/ Matt (004), Maheshkumar Chaudhari a/k/a "Mahesh" (005) | ) ) ) ) ) | Case No.  4:25MJ3187 |
| *Defendant(s)* | | |

OFFICE OF THE CLERK  2025 AUG 11  PM 2:43  U.S. DISTRICT COURT DISTRICT OF NEBRASKA  FILED

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___January 1, 2020 - August 8, 2025___ in the county of ___Douglas, Sarpy and Madison___ in the

_____ District of ___Nebraska___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1594; 18 U.S.C. § 1591 | Conspiracy to engage in sex trafficking (001, 002, 004) |
| 18 U.S.C. § 1589 | Conspiracy to engage in labor trafficking (001, 002, 003, 004) |
| 18 U.S.C. § 371;18 U.S.C. § 1546 (a) | Conspiracy to defraud the United States by fraud and misuse of visas, permits and other documents (001, 002, 005) |
| 8 U.S.C. § 1324(a)(1)(A)(ii),(iii), (v) | Conspiracy relating to transportation of Illegal Aliens (001, 002, 003, 005) and harboring certain Illegal Aliens (001, 002, 003) |
| 18 U.S.C. § 1071 | Concealing person from arrest (001, 002, 004) |
| 21 U.S.C. § 856 | Maintaining drug-involved premises (001, 002, 003, 004) |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

_____
*Complainant's signature*

SA Rachel Sullivan, FBI
*Printed name and title*

☐ Sworn to before me and signed in my presence.

☑ Sworn to before me by telephone or other reliable electronic means.

Date:  8/11/2025

_____
*Judge's signature*

City and state:          Lincoln, Nebraska

Jacqueline M. DeLuca, U.S. Magistrate Judge
*Printed name and title*

COPY USA

## AFFIDAVIT IN SUPPORT OF ARREST WARRANT

1.      I, Rachel J. Sullivan, being duly sworn, do hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

2.      I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been since January 2021. I attended new agent training at the FBI Academy in Quantico, Virginia. In conducting my official duties, I have authored affidavits in support of search warrants and criminal complaints. I have participated in controlled substance investigations of alleged criminal violations of the Controlled Substances Act laws. I have participated in investigations involving the purchase of controlled substances from suspected narcotics traffickers using confidential sources. I have participated in the execution of search warrants for controlled substances, the proceeds, and documentary evidence of drug trafficking. I have been involved in investigations where Confidential Informants or Confidential Sources of Information were utilized to obtain evidence against federal targets. I have participated in investigations where electronic evidence was the primary evidence used to obtain federal criminal charges. I have participated in debriefings and interviews of witnesses and targets involved in white collar and narcotics offenses and in the concealment of proceeds derived from those criminal acts. I have been involved in the execution of federal warrants related to a variety of federal crimes to include white collar and narcotics offenses. As a result, I have encountered and become familiar with the various tools, methods, trends, used by individuals who commit white collar and narcotics offenses. Furthermore, I have interviewed defendants, subjects, victims, witnesses, and confidential informants and have discussed with them methods used by individuals who are engaged in white collar and narcotics offenses and what efforts those individuals make to successfully conceal themselves from detection by law

1

enforcement. I am also familiar with the manner in which individuals involved use telephones, cellular telephone technology, coded communications, or slang-filled telephone conversations and/or text message communications, how they utilize false or fictitious identities, and other means to facilitate their illegal activities to thwart law enforcement investigations.

3.       As part of my duties as a FBI Special Agent, I am authorized to investigate criminal violations related to the Immigration and Nationality Act (Title 8, U.S.C., Section 1357, et seq.), such as harboring and transportation of aliens, violations of Title 18 of the United States Code., to include labor trafficking, sex trafficking, drug trafficking offenses, financial crimes, and other federal criminal offenses, to include money laundering of proceeds generated by specified Title 8 and Title 18 offenses.

4.       This affidavit sets forth probable cause for a criminal complaint and a warrant to be issued for the arrests of Ketankumar Babuhai Chaudhari, a/k/a "Ken," (Ken), Rashmi Ajit Samani, a/k/a Falguni Samani, (Rashmi), Amit Prahladbhai Chaudhari (Amit), Amit Babubhai Chaudhary a/k/a "Matt," (Matt), and Maheshkumar Amrutlal Chaudhari a/k/a "Mahesh" (Mahesh) for crimes they have committed in the District of Nebraska.

5.       Based on the facts set forth in this affidavit, I have probable cause to believe that beginning on at least January 1, 2020 and continuing through August 8, 2025, Ketankumar Babuhai Chaudhari, a/k/a "Ken," (Ken), Rashmi Ajit Samani, a/k/a Falguni Samani, (Rashmi), Amit Prahladbhai Chaudhari (Amit), and Maheshkumar Amrutlal Chaudhari a/k/a "Mahesh" (Mahesh) violated the following:

a.       8 U.S.C. 1324(a)(1)(A)(ii) – transportation of aliens;

b.       8 U.S.C. 1324(a)(1)(A)(v)(I) - engages in any conspiracy to commit any of the acts defined in 8 U.S.C. 1324(a)(1)(A)(i) to (iv);

c.       Aiding and Abetting the other Target Offenses, in violation of 18 U.S.C 2;

6.  Additionally, based on the facts set forth in this affidavit, I have probable cause to believe that beginning on at least January 1, 2020 and continuing through August 8, 2025, Ketankumar Babuhai Chaudhari, a/k/a "Ken," (Ken), Rashmi Ajit Samani, a/k/a Falguni Samani, (Rashmi), Amit Prahladbhai Chaudhari (Amit), and Amit Babubhai Chaudhary a/k/a "Matt," (Matt) violated the following

    a.   18 U.S.C. 1581 – Labor Trafficking by Peonage;

    b.   21 U.S.C. 856(a)(1) and (a)(2) – using, maintaining, and/or managing a drug premises

    c.   Aiding and Abetting the other Target Offenses, in violation of 18 U.S.C 2;

7.  Further, based on the facts set forth in this affidavit, I have probable cause to believe that beginning on at least January 1, 2020 and continuing through August 8, 2025, Ketankumar Babuhai Chaudhari, a/k/a "Ken," (Ken), Rashmi Ajit Samani, a/k/a Falguni Samani, (Rashmi), and Amit Babubhai Chaudhary a/k/a "Matt," (Matt) violated the following

    a.   18 U.S.C. 1594, 1591 – conspiracy to commit sex trafficking

    b.   18 U.S.C. § 1071 – concealing person from arrest

8.  Additionally, I have probable cause to believe that beginning on at least January 1, 2020 and continuing through August 8, 2025, Ketankumar Babuhai Chaudhari, a/k/a "Ken," (Ken), Rashmi Ajit Samani, a/k/a Falguni Samani, (Rashmi), and Amit Prahladbhai Chaudhari (Amit) violated the following

    a.   8 U.S.C. 1324(a)(1)(A)(iii) - knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation;

9.  Finally, based on the facts set forth in this affidavit, I have probable cause to believe that

3

beginning on at least January 1, 2020 and continuing through August 8, 2025, Ketankumar Babuhai Chaudhari, a/k/a "Ken," (Ken), Rashmi Ajit Samani, a/k/a Falguni Samani, (Rashmi), and Maheshkumar Amrutlal Chaudhari a/k/a "Mahesh" (Mahesh) violated the following

    a.    18 U.S.C. 371 – Conspiracy to defraud the United States;

    b.    18 U.S.C. 1546 – Fraud and misuse of visas, permits, and other documents;

9.  These violations occurred at specific locations, notably:

    a.  A hotel/motel formerly branded as the Super 8 and currently known as the "Inn and Suites," located at 9305 S. 145th Street in Omaha, Nebraska (hereinafter "TARGET PREMISES #1"). The hotel was purchased on March 8, 2019, by Ken and Rashmi, through a limited liability corporation (LLC);

    b.  A hotel/motel formerly branded as the Americinn, located at 2920 S. 13th Court in Omaha, Nebraska (hereinafter "TARGET PREMISES #2"). The hotel was purchased on June 15, 2023 by Rashmi and Ken through an LLC. Rashmi is listed as an 80% owner of that LLC;

    c.  A hotel/motel known as the New Victoria Inn and Suites, located at 10728 L St. Omaha, NE 68127 (hereinafter "TARGET PREMISES #3"). The hotel was purchased on April 9, 2021 by Ken and Rashmi through an LLC. Ken is listed as a 80% owner of that LLC;

    d.  A hotel/motel known as the Rodeway Inn, located at 1110 Fort Crook Rd. S. Bellevue, NE 68005 (hereinafter "TARGET PREMISES #4), Omaha, Nebraska. The hotel was purchased on March 10, 2023 by Ken and Rashmi through the use of an LLC;

    e.  Brow and Lash beauty bar/salon, owned by Ken and Rashmi, located at 602 S. 72d St. Omaha, NE 68114 (hereinafter "TARGET PREMISES #5");

f. Brow and Lash beauty bar/salon, owned by Ken and Rashmi, located at 10000 California St, Omaha, NE 68114. This target encompasses three locations all at Westroads Mall – a physical salon occupying Mall Suite #2417, another physical salon occupying an unknown Mall Suite, but located on the 2nd Floor of Westroads Mall next to JCPenny's and Raising Canes, and a mall kiosk physically located on the 2nd floor of Westroads Mall near GNC and PacSun (all hereinafter "TARGET PREMISES #6");

g. Brow and Lash beauty bar/salon, owned by Ken and Rashmi, located in the top floor at OakView Mall at 144th St, Omaha, NE (hereinafter "TARGET PREMISES #7");

h. Brow and Lash beauty bar/salon, owned by Ken and Rashmi, located at 3316 N 108th St, Omaha, NE (hereinafter "TARGET PREMISES #8");

i. 2306 N 182nd Ave Elkhorn, NE 68022, a primary residence of Ken and Rashmi (hereinafter "TARGET PREMISES #9"); and

j. 402 Blaine St. Norfolk, NE, Norfolk, Nebraska, another residence associated to Ken and Maheshkumar Chaudhari (hereinafter "Mahesh) (hereinafter "TARGET PREMISES #10").

## ALIENAGE OF THE TARGET PERSONS

10. According to immigration records, KETANKUMAR BABUBHAI CHAUDHARI, a/k/a "Ken," does not appear to be legally in the United States and appears to be subject to removal proceedings, he has been denied several visas, including a marriage one, because of fraud, was denied an investor visa, and was denied a T visa, it appears he has a pending U-Visa application as the derivative of Rashmi;

11. According to immigration records, RASHMI SAMANI, Rashmi, Ken's wife, had a judgment of removal entered on May 5, 2022 but her appeal is pending. The immigration

judge found marriage fraud. She also has a pending U-Visa, which is discussed below;

12.    According to immigration records, AMIT CHAUDHARI, a/k/a "Matt", brother of Ken, has a pending U-Visa application, but does not have current legal status.

13.    According to immigration records, AMIT CHAUDARI, brother of Rashmi Chaudhari, has no legal status to be in the United States.

14.    According to immigration records, MAHESHKUMAR AMRUTAL CHAUDHARI a/k/a "Mahesh", is a B1 overstay but has a pending asylum claim.

## BACKGROUND AND PROBABLE CAUSE

15.    This is a long running investigation that targeted suspected labor and sex trafficking of aliens, victims, minors, and others at several hotel locations owned and operated by Ken and his family members, to include his wife Rashmi, his brother Amit, a/k/a "Matt," and his wife's brother, also named Amit. For years, various law enforcement officers in Nebraska working at the state, local, and federal levels have either responded to public safety calls to these businesses or had federal investigations or federal fugitives with significant ties to these locations. Minor victims of sex trafficking have been rescued from one or more of the hotels, and drug trafficking and use at all of the hotels is open and notorious according to surveillance, cooperating sources, online guest reviews, and other evidence gathered during the investigation. On numerous occasions, the United States Marshals Service has tracked fugitives to one of the hotels in particular, the SUBJECT PREMISES #3, only to meet obstacles and difficulties in locating and apprehending fugitives staying at that location. The apparent rampant criminality going on at these hotel locations led to the launching of a full-fledged federal investigation into human trafficking, drug trafficking, financial crimes, and immigration crimes. A portion of the facts revealed during this large scale and complex

investigation will be provided in this affidavit to support the applications for arrest warrants.

16.      For approximately four years, a Task Force Officer (TFO) with Sarpy County investigated a group of hotels and other businesses in which Ken and Rashmi were the owners and/or operator. Information received from sources who were developed by law enforcement who worked as employees of the hotel, as well as long-term residents of the hotels identified Ken as the owner of these businesses. Sources further identified that family members of Ken participated in management of these businesses. Those family members in management beside Ken identified by sources and other means of investigation include Matt, brother to Ken; Rashmi, wife of Ken; Amit, the brother of Rashmi and Mahesh, identified as a mentee of Ken's.

17.      In addition to known individuals operating at the motels sources and investigators have observed other family members or other individuals believed to be potentially trafficked from India for a source of labor. Over the course of the investigation, several of the family members have been moved from one location to another as live in employees or moved out of state to other business entities believed to be related to Ken.

18.      Hotel management and ownership have directed law enforcement sources to participate in theft and robbery conspiracies on their behalf. Sources have provided assistance in apprehending sex trafficking suspects operating out of the hotels. Sources have further provided information that there are illegal aliens working at the hotel, primarily from the nation of India, who are being exploited by Ken and management. The information caused investigators to be concerned that some or all of the immigrants working at the hotel may be victims of labor trafficking.

19.      The Sarpy County TFO and FBI Agents assigned to the investigation interviewed

multiple individuals who described themselves as employees at the hotels and explained that they lived there, worked there but received no actual pay and often were told they owed money to the motel for rent. In order to pay rent, the employees were solicited for sex acts or solicited to steal property including retail items like cologne and clothes, electronics, landscaping supplies and tools. These interviews corroborated information received from sources about the possible victimization of the employees at the hotels.

20.    Information from multiple sources revealed several of the non-relative live-in employees were forced to work long hours for no pay, and in lieu of being kicked out of the hotel for non-payment, they would engage in criminal activity on behalf of the hotel. Specifically, source information stated that TARGET PREMISES #1 was a location where the management staff preferred the workers to acquire stolen clothes from high end retail stores in the metro like designer jeans, Ralph Lauren Polo, cologne and electronics. Other source information stated that TARGET PREMISES #3, specifically Amit and Matt, wanted employees to steal or acquire high-end electronics, landscaping materials, hand tools and power tools.

21.    From 2022 to 2023, multiple sources lived for extended time periods in TARGET PREMISES #3, and those informants indicated it was common practice during that timeframe for known fugitives, many being sought by the United States Marshals Metro Fugitive Task Force to stay at TARGET PREMISES #3 and pay Matt between $20-$40 with the agreement that Matt would lie to law enforcement officers if they came looking for the fugitive renting the room. Sources further stated that Matt and hotel staff would book the fugitives in under false names or move their rooms to an undocumented room within the hotel. Contacts with the USMS task force confirmed it was common to have issues at these specific hotel locations

8

in finding wanted parties tracked to these hotels.

22.    During the same time period, a source had informed the TFO that Matt at TARGET PREMISES #3 had solicited them for sex at the motel in lieu of paying their monthly bill. At the time the source was not engaging in prostitution, but had in the past, and felt that she was coerced into performing sex acts with Matt in lieu of paying for the stay at the motel. That source had also stated that other individuals engaging in commercial sex acts on the property had been solicited by Matt for similar experiences.

23.    Drug trafficking at the hotels has been a separate concern for law enforcement. Overdoses at some of the hotels have been a significant concern. Those facts will be provided in more detail later in this affidavit.

### Alien Harboring, Transportation, and Labor Trafficking Overview

24.    The federal investigation has revealed through cooperating sources, traffic stops, and the collection of digital evidence that most of the work force recruited and harbored by the TARGET PERSONS at the target hotel premises (TARGET PREMISES #1 through #4) are aliens who are unlawfully present in the United States. Investigation has further revealed that these aliens are being exploited by the TARGET PERSONS. Many times, these employees are not paid for their labor. They are required to live at the target hotels, but they are also charged money to reside at the hotels. They are kept in unsafe living and working conditions and expected to work long and exhausting hours. One source who has proven reliable, disclosed to law enforcement one time they entered a room on the fourth floor of the TARGET PREMISES #3 and observed two alien workers sleeping on the floor of the crowded room with cockroaches crawling on them while they slept.

25.    The week of June 16, 2025, the source was contacted by Ken to travel to North

9

Carolina to pick up people. The source was not initially informed of many details of the arrangement, but was provided a Home Depot box truck to accomplish the task and told the people were moving to do "some housekeeping work at our hotel." The source was also provided an address to go to and a phone number to call to arrange the transfer of the people. Eventually, the source learned the people to be picked up was in fact a family – a man, a woman, and two minor children.

26.      The source voiced concern to Ken as to how they were going to transport two adults, two children, and themselves back in the cab of the box truck as it was originally meant to seat only two people. After pressing Ken about this, he ultimately agreed to let the source take an F150 pickup that he owns instead.

27.      On the way back, a traffic stop was initiated in Tennessee by law enforcement to identify the people. The adults and children provided identification. HSI agents in Tennessee informed the investigative team that the individuals entered the country illegally in 2022 but were "paroled" into the United States because of a lack of bed space to hold them. HSI Tennessee advised that under current policies they would typically detain the adults and hold them at this time pending immigration court, but because of the presence of minor children, they would instead typically issue citations ordering them to appear in court instead. Ultimately, the agents issued citations ordering the people to appear in immigration court on August 4, 2025, in Omaha.

28.      During the traffic stop, through both conversations with the source and through the use of a recording device in the vehicle, investigators know the family attempted to contact Ken and Rashmi. The family also told law enforcement on scene at the stop that they were going to Nebraska for one month for "vacation" and that a friend is paying for the trip.

The adult male was asked for the name of the friend, and the adult male stated his friend's wife's name is Falguni. The investigative team knows Falguni is a name Rashmi also goes by in the Indian community. Also, during the traffic stop, the source contacted Ken, telling him the source did not want to get in trouble for driving people who say they are illegal across state lines. Ken told the source to say they did not know about it and to not give his hotel address or anything because that is not "good for business".

29.    Ultimately, the family continued to Nebraska and were initially dropped off at TARGET PREMISES #1 but were then moved to the TARGET PREMISES #4 a day or two later. From source reporting and law enforcement surveillance, the investigative team knows the family is currently living and working at TARGET PREMISES #4.

30.    A source observed that the husband was now working behind the front desk of that hotel location at night. A source was told that the wife working in what was apparently a housekeeper role. Law enforcement surveillance also observed the wife working in a housekeeper role at TARGET PREMISES #4, accompanied by the minor children. The minor female child, approximately twelve years old, was actively engaged in housekeeping duties, while the minor son, under ten years old, trailed along.

31.    The family did appear as directed in Omaha on August 4 as directed by their citation, but were told to come back August 6, which they did. The family was also interviewed. The father advised that he lives at his friend's hotel. He identified the friend as "Ketan Chaudhari" and the hotel as TARGET PREMISES #4. He said his friend would help them find a house to rent.

32.    The father also advised that he met "this man" believed to be referring to Ken through a message he found in a temple in Virginia. The message said if you need help reach

out and I will assist. He called the man and the man sent a person and a vehicle to pick them up.

33.    The father stated the family has been helping Ken by caring for his kids, doing yard work, and other miscellaneous work around the hotel, since he is staying at the hotel and not paying. He specifically denied working at the hotel, said he is just helping in return for a place to stay. He did say he had filed for a work permit with the help of his attorney, believed to be in Georgia.

34.    The father also claimed his children were in school but was not able to mention the school and no registration was found.

35.    The following day, the father contacted immigration authorities and advised that he wished to relocate to an address in Virginia in a week. He stated his reason for wanting to leave is that transportation to school for his two children did not work out. As noted above, immigration could not find any record for school enrollment for the family's children.

36.    The request to relocate was denied at this time.

37.    In July 2025, another confidential source, who was no longer associated with the hotels, met with an FBI agent and a TFO to discuss trips around the United States that this source made at the direction of Ken.  This same source was also aware that Ken owned motels and businesses in other states including Georgia and Texas. This source made at least three cross-country trips for Ken.  The first was in September of 2024 when the source drove a rented U-Haul moving truck from Omaha, Nebraska to Atlanta, Georgia.  On that trip, the source was transporting kiosk style displays to a mall in the Atlanta area for a business the source believed was also owned by Ken. On the second trip, the source was contacted and given approximately 24 hours' notice that the source needed to drive to Grand Forks, North

Dakota for Ken to pick up three people.

38.     The location for pickup was a Country Inn and Suites located 3101 S. 42nd Street in Grand Forks. The three individuals that the source picked up for Ken were assessed by the source to be an Indian male, female, and minor Indian female who appeared to be around sixteen years of age to the source. Ken only allowed the source a few hours to sleep after picking up the three persons just described before sending the source on to a location in Humble, Texas where the source was to meet Amit.

39.     During the drive to Texas, the source attempted to speak with the approximately 16-year-old female because she spoke the best English of all three of the persons transported by the source; however, the young girl could not provide consistent information about her grade in school, her relationship to the two adults, and was generally evasive in her answers about their possible familial relationship. The girl indicated all three were on their way to Texas to work at a hotel. The source advised the investigators that this trip occurred back in November 2024. The source was not working with investigators at the time of this trip.

40.     For both trips described, the source was paid approximately $800 by Ken each time and received only approximately 24 hours' notice of the needed trip. The same was also true of the third trip Ken requested the source to make in December 2024.

41.     In December 2024, the source stated that Ken gave the source a day's notice to go to St. Cloud, Minnesota to pick up three people. This was early December. Again, the source was to drive to the destination address and then pick up three people to transport them to the same address in Humble, Texas. This time there was an adult male, an adult female, and a juvenile male. The male was younger, and the source estimated his age was approximately between 8 and 10 years old. The source had to use a translation application to communicate

13

about necessities with the family. The same Amit was the designated contact for the source. The source was not paid the full agreed amounts for the first two trips by Ken, so this time, the source was able to get paid around $1,000 to $1,200 for this trip. The source noted that when safety concerns would be raised in connection with the travel arrangements for the trip that Ken would dismiss those concerns completely. Ken would also push the source to transport these people as quickly as possible to get them to their destination hotels in a manner that the source described as akin to constant harassment of the source by Ken. The source would not be allowed to get adequate sleep before starting the drive to Texas. The source assessed that the people transported were being put to work in the hotel in Texas. Overall, the source was growing increasingly suspicious of these trips and turned Ken down when Ken pressed the source to make a fourth trip. One screenshot of the text messages exchanged by the source and Ken concerning transporting the people to the hotel in Texas is captured below:

<      **KB**
           Ken >

**Drop off address**
**Amit Chaudhari**
<u>402-804-0862</u>

<u>21019 Ingram House</u>
<u>Way</u>
<u>Humble TX 77338</u>

**Pick up address**

**Countryinn and**
**suites**
**Grandforks**

<u>3101 South 42nd</u>
<u>street Grand forks</u>

**Super 8 has**

42.     In 2023, a cell phone belonging to Ken was seized, and, pursuant to a warrant based on the facts of this case, searched in July of 2025. A search of the phone revealed WhatsApp messages between Ken and others indicative of smuggling human beings from Indian. For example, WhatsApp message thread summary between ███-1442 "Ketan (owner)" and ███-8054 "Niraj Bhai Bhai" (This conversation was completely translated from Gujarati to English utilizing Google Translate) consisted of Ken asking Niraj if he could have someone transported for $27,300 and he was asking on behalf of someone else. Niraj advised Ken the price was $79,000 and a $50,000 difference was a lot. After this conversation there was a voice call, followed by Ken providing Niraj with the name of the person he wanted transported "Chaudhary madhabhai sendhaBhai" from "Khata amba", a small village in Mansa, Gandhinagar, Gujarat, India, which is located near Ken's village of Indrapura. During the conversation, Niraj indicated $27,300 would be accepted and Ken said the money

15

would be given to "Maulin". There were 2 more people mentioned for the prices of 3 Lakh INR ($3440) and Niraj countered with $3800 and Ken agreed. Ken provided the name of "Peladji bananji". Ken additionally provided the name "Babubhai" for $2300 and Niraj agreed. Spending "60/70 lakhs" was also consistent with the price given by Niraj to Ken for transporting a person from India to the United States of America, as 70 lakh INR is $79,000 exactly as Niraj quoted.

43.     There were multiple conversations between Ken and Rashmi concerning their employees found in the same phone. Ken and Rashmi shared various pictures of handwritten time cards for employees and discuss the pay of the employees. Many pictures of credit cards were shared and passcodes and PINs were shared as well. One of the notable messages was in the Gujarati language and was a lengthy text. A Task Force Officer translated the message from Gujarati into English utilizing Google Translate. It was sent from Ken to Rashmi – and read as follows "Anjana Chaudhary Society For the youth living in USA ....Friends, you work hard for your home, family and society for 16/18 hours and make your career, at the same time you increase the pride of your home, family and society, you have the desire to marry in the society with your high feelings and culture and good values and you take the daughters of the society from your homeland to America by spending 60/70 lakhs, but 98% of the daughters of the society are cultured and take care of the respect of their parents and you increase the pride of your daughter and the parents, but 2% are rascals, they are not bathed, they smell and they do not see, they see and they get more than they see, so the one you have taken comes there and runs away. Many such cases have happened recently, you take the 60/70 lakhs you have collected by working day and night and take them from India to America and such rascals run away somewhere else, such The parents of the criminals are

also responsible for the greed for money, and such people are a disgrace to the society, so if they do this, they will be in second place elsewhere. File a police complaint against them, catch them and deport them. If you cannot do it, then give dollars to a local American white or black person and file a police complaint with them and deport them, otherwise this evil will increase and the society will become disgraced. In the long run, such people will cause more damage to the society. Therefore, if you do not take them seriously and deport them, then the poor farmer families and hardworking people will be ruined and there will be a bad image in the society. N. D. Chaudhary Ishwarpura Badpura." This message is consistent with elements of labor trafficking by deporting or threatening to deport people if they do not follow what their society asks of them.

44.     Ken also had multiple photos saved on the phone for unemployment benefits that were filled out, including one for an employee who could not work any longer due to having children. It is unknown why Ken maintained possession of these documents, but holding employment documents is also consistent with labor trafficking.

45.     The TFO reviewing the phone further observed several timecards for employees, and employees who were documented citizens of the United States of America had timecards where the time in and out was stamped on and exact hours were calculated with exact pay (example: one time card showed 10.05 hours for Shannon Gensler and another for 21.20 hours for Shannon). One paystub was from Miranda Hahn living at 1201 W Saunders St. in Mt. Pleasant, IA while she was working at the Comfort Inn at 1200 E Baker St in Mt. Pleasant Iowa. This paystub indicated she worked 100 hours in a 2 week period and was paid overtime for her extra 20 hours. Under her "adjustments to net pay", it showed child support was removed for $2. 76 and "Room Rental" was removed for $316, bringing her total pay for 100

hours $363.99. It appeared Miranda underlined the "room rental" section and wrote "Bullshit" next to it and signed her name "Miranda Hahn 12/7/18.

46.    TFO observed hand-written time cards for employees who had names of Indian origin and were apparently undocumented in the United States. The hand-written time cards appeared to be written with the same pen by the same hand writing for an entire month at a time (example: for employee "Memishei" in October 2022 they worked at the "W store and "New store" every single day in October. Their hours were simply the hours the shops were open each day, which totaled 286 hours, which is an average of 9.2 hours every day with no days off.

47.    The following is a list of businesses observed in pictures on Ken's phone that he is involved with and their locations, as of 2023. This list likely does not contain all of the businesses related to Ken:

TKC and KFKC LLC 4800 Golf Rd Suite 69 in Eau Claire, Wisconsin.
TKC & KFKC LLC "Brow Beauty" Ketankumar Chaudhari Mbr 2427 N 187th Ave Elkhorn, Nebraska
TKC & KFKC LLC BROW BEAUTY 13408 C St Omaha, Nebraska
TKC & KFKC LLC 2427 N 187th Ave Elkhorn, Nebraska (Oakwood Hills Mall, Chicago)
TKC (Valley View) (Oakwood} (Maple) (Oak Store) 10%
Keya & Tia LLC "Cellairis" Ketankumar Chaudhari Mbr 2427 N 187th Ave Elkhorn, Nebraska
Keya & Tia LLC "Cellairis" 13408 C St Omaha, Nebraska
Keya & Tia LLC 2525 N 110th Ct#112 Omaha, Nebraska
Keya&tia LLC DBA Cellphonia Fast Fix (Valley View Mall Wisconsin)
Cellphone repair shops: 1 at Oakview Mall, 1 at Valley View, 2 at Westroads Mall, 1 at Gateway Mall
Jay Arbuda LLC "Phone Fix" 2427 N 187th Ave Elkhorn, Nebraska
Jay Arbuda LLC Ketankumar B Chaudhari Mbr 2427 N 187th Ave Elkhorn, Nebraska (IRS Utah)
Jay Arbuda LLC 13408 C St Omaha, Nebraska
Jay Arbuda LLC 2525 N 110th Ct Omaha, Nebraska
Jay Arbuda LLC 3024 Hidden Forest Ct #4103 Marietta, Georgia
Jay Arbuda LLC (Galleria at Wolfchase Memphis, Tennessee)
Jay Arbuda LLC Shahinian RPG, Inc.IC.A.RT. OBA: Arbuda Makeover Studio 13408 C

St Omaha, Nebraska (St Charles Town Center Waldorf, Maryland)

Jay Ma Kari LLC "Quality Inn Suites" 2427 N 187th Ave Elkhorn, Nebraska

Jay Ma Kari LLC Quality Inn & Suites 1200 E Baker St Mt. Pleasant, Iowa

Red Carpet Inn Best Pub 9305 S 145th St Omaha, Nebraska

Brow & Beauty 13438 C St 2427 N 187th Ave Elkhorn, Nebraska

Laxmi Mata Vishnu Bhagvan, LLC 2427 N 187th Ave Elkhorn, Nebraska (Willowbrook Mall Texas) (Mall of Louisiana) (D/B/A Brow Beauty at Deerbrook Mall Texas) (D/B/A Brow Beauty at Hulen Mall Texas) (Town East Mall Texas) (DBA Brow Beauty at First Colony Mall Texas) (Saybrook Mall Texas)

Bapa Gogaji LLC 2427 N 187th Ave Elkhorn, Nebraska (Georgia Department of Labor)

Bapa Gogaji, LLC 3024 Hidden Forest Ct. #4103 Marietta, Georgia

Phone Fix USA Ken Chad 10000 California St Omaha, Nebraska

Cellphonia Kiosk Ken Chad Gateway Mall 6100 0 St Lincoln, Nebraska

Jay Sadhi Maa LLC Hinaben B Chaudhari Mbr 13408 C St Omaha, Nebraska (IRS Utah)

Jay Sadhi Maa Brow Beauty 13408 C St. Omaha, Nebraska

Jay Sadhi Mall (Ames) (72nd) "33%"

Maharaj Bapa LLC 2427 N 187th Ave Elkhorn, Nebraska

Maharaj Bapa LLC DBA The Pub 2427 N 187th Ave Elkhorn, Nebraska

Maharaj Bapa LLC 9305 S 145th St Omaha, Nebraska

Mount Pleasant Investments LLC 1200 E Baker St Mt. Pleasant, Iowa

Mount Pleasant Investments LLC Ketankumar Chaudhari 1200 E Baker St Mt. Pleasant, Iowa

Mount Pleasant Investments LLC Ketankumar Chaudhari Mbr 1200 E Baker St Mt. Pleasant, Iowa (IRS New York)

Mount Pleasant Investments LLC Ketankumar Chaudhari Mbr 2427 N 187th Ave Elkhorn, Nebraska (IRS Ohio)

Mount Pleasant Investments LLC Ketankumar Chaudhari Mbr 13408 C St Omaha, Nebraska (IRS Utah)

Goga Bapa LLC (State of Wisconsin)

Gago Bapo D/B/A Arbuda Makeover Studio (Town Center at Cobb Georgia)

Mahi LLC

Arbuda Makeover Studio 13408 C St Omaha, Nebraska (Yorktown Center Illinois)

Arbuda Makeover Studio (Arbor Place Mall, Georgia)

Brow Beauty Laxmi Mata Vishnu Bhagvan, LLC 2427 N 187th Ave Elkhorn, Nebraska (Parks at Arlington)

Bapa Maharaj LLC C/O Ketankumer B Chaudhart 2427 N 187th Ave Omaha, Nebraska

VED, LLC

Shapes Brow Bar Desert Sky Mall Phoenix, Arizona

Lexurious liquor & smoke (Texas)

Alpha Traders Inc 315 Smallwood Dr Waldorf, Maryland

OM Shanti International LLC D/B/A Arbuda Beauty Care 11220 Heron Pl Apt 6 Waldorf, Maryland

Brow Beauty 13408 C St Omaha, Nebraska

Brow Beauty Ketankumar Chaudhari 13408 C St Omaha, Nebraska (La Crosse, Wisconsin)

Radhey Lodging DBA Comfort Inn 1200 E Baker St Mt Pleasant, Iowa

Eyebrows Henna Inc
Brow & Lash 108th & Maple St
Ken Chad Eyebrow Beautification 2427 North 187th Ave Elkhorn, Nebraska

48.     Jashubhai Karshanbhai Chaudhari has been revealed by this investigation to be someone who works as a driver for the TARGET PERSONs by transporting alien employees from TARGET PREMISES #3 to the Brow and Lash salons located at the Westroads Mall. Jashubhai Chaudhari entered the United States without inspection on or about February 2022. At that time, he was determined not to have status to be in the United States, and he was served a Notice to Appear for an October immigration hearing. Also at that time, Jashubhai Chaudhari, who entered the United States illegally with his wife and their minor child, declared that he would reside at a street address corresponding to TARGET PREMISES #3, Room 419. This address was apparently known to Jashubhai Chaudhari at the time he entered the United States. In other paperwork in immigration records, Jashubhai Chaudhari claimed TARGET PREMISES #1 as another personal address for himself. Jashubhai Chaudhari has been confirmed by at least one source deemed reliable in this investigation to still be working at TARGET PREMISES #3.

49.     Officer surveillance and source information has caused the investigative team to assess that part of Jashubhai Chaudhari's job is to transport workers who are staying at the target PREMISES to their jobs at the brow salons. During one surveillance operation in recent months, agents and officers followed a vehicle that is believed to be operated by Jashubhai Chaudhari from TARGET PREMISES #3 to the Westroads Mall. Agents and undercover officers observed four females get into the vehicle at the hotel, and they were able to observe their general physical appearance and clothing at the time. Later while agents and officers were going into and past the Brow and Lash locations owned and operated by Ken and

Rashmi inside the mall, the investigators were able to locate and identify three of the four

females working inside the salons and a fourth one was located sitting next to the "Brow Bar"

kiosk on her phone.

50.      Previously, a phone used by Ken in 2023 was seized during a robbery, discussed

below. That phone was searched pursuant to a previously issued federal warrant. In reviewing

that phone, the investigative team found that Ken had saved a copy of Jashubhai Chaudhari's

Indian passport and separately even had a saved copy of ICE paperwork documenting issues

with Jashubhai Chaudhari's status to be in the country.  Based on the foregoing, agents assess

that Jashubhai Chaudhari, who is likely a relative of Ken, came into the country illegally

knowing that he would be working for Ken and staying at properties associated with him,

notably TARGET PREMISES #1 and #3. Ken either knew or recklessly disregarded that

Jashubhai Chaudhari was an alien with no status to be in the United States because Ken had

copies of the ICE violation paperwork and the actual Indian passport in Jashubhai

Chaudhari's name.  Ken facilitated Jashubhai's unlawful presence by providing a residence

and job for Jashubhai Chaudhari.  Below is a snapshot of the evidence located in Ken's digital

phone evidence, which was obtained by a judicially authorized warrant:

FINS #:1105231516          Subject ID:374829425          Event No:YUS2202000045

| 1. FAMILY NAME (Capital Letters)  First Name  Middle Name | | 2. Age | 3. Country of Citizenship |
|---|---|---|---|
| CHAUDHARI, JASHUBHAI KARSHANBHAI | | 46 | INDIA |
| 4. Alias | | 5. Date Apprehended  February 01, 2022 | 6. Office  YUH/YUS |

| 7. Birth Date | 8. Birth Place  INDIA |
|---|---|
| 9. Sex  ☒ Male  ☐ Female | 10. OSC/WA Served  ☐ Yes  ☒ No  (Explain) |
| 11. File Number | 12. Bond  $  Date Posted |
| 13. CINS  ☐ Yes  ☐ No | 14. Medical Alert  ☐ No  ☐ Yes  (Explain) |

| 15. TRANSFER DATE | FROM | TO |
|---|---|---|
| A | | |
| B | | |
| C | | |

| 16. ADMITTED BY: | 19. RELEASED TO: ☐ V/R ☐ Depot | 22. Rt. Index Print - In | 23. Rt. Index Print - Out |
|---|---|---|---|
| 17. SEARCHED IN BY: | 20. RELEASED BY: | | |
| 18. DATE ADMITTED: | 21. DATE RELEASED: | | |

24. Remarks: See I-831

FORM I-385 (06 07 07)          ALIEN BOOKING RECORD
UNITED STATES DEPARTMENT OF HOMELAND SECURITY



भारत गणराज्य REPUBLIC OF INDIA

P          IND

CHAUDHARI

JASHUBHAI KARSHANBHAI

INDIAN          M

MEU MEHSANA, GUJARAT

AHMEDABAD

13/05/2014          12/

J K C

P<INDCHAUDHARI<<JASHUBHAI<KARSHANBHAI<<

51.     Not all of the employees at the TARGET PREMISES are aliens. One former employee who is a United States citizen with a drug problem also worked for several of the locations and received living accommodations at the hotel.

22

52.    Law enforcement interviewed this employee while he was in custody in Sarpy County Jail for failing to appear for a court hearing. During the course of the interview, this person advised that they were regularly not paid the wages that were promised by Ken and the other owners and managers.  The former employee worked at TARGET PREMISES #1, 2, and 3, starting in 2020. The employee agreed to be paid a set amount and receive a hotel room to live in. This employee was aware that Ken and Rashmi are associated by family ties and common employees to a similar hotel in Atlanta, Georgia.

53.    This former employee disclosed to law enforcement that for a period of time he moved to Atlanta, Georgia and worked at that the Red Roof Inn alongside Matt.  The former employee consented to a search of his phone. Investigators found the following text message that the former employee sent concerning the working conditions at the Atlanta hotel location associated with multiple subjects from the Nebraska investigation:



54.    The "more of the same" reference in the above text messages is assessed by investigators to be a reference to the target hotel premises in Nebraska because the sender of those text messages worked for multiple hotel locations that are the target of these search warrants. That makes those hotel locations the most likely locations to be similar to the Atlanta location described in these text messages.

55.    The former employee told investigators that he would be threatened similar to the alien employees, specifically sharing he was told that if he quit "you'll never work in this country again". He took that to mean he would never work in the hotel industry again. The former employee shared with investigators that all the managers of the target properties "use the same playbook regarding not paying their employees." He went on to say, "once you're working there and not getting paid, you're at their mercy." The former employee observed that Ken and those working with him took advantage of people with little to no other options.

56.    The former employee stated that he would receive a W2 from Ken each year representing that he only made approximately $40,000. The former employee stated Ken never paid him more than $4,000 total over the three years he worked for Ken. He worked almost every day at the hotels for Ken and was required to clock in every single day he worked. Occasionally, he worked 72 hours straight.

57.    On July 17, 2025, the Human Trafficking Hotline received a tip involving potential adult and minor victims involved in labor trafficking situation in Omaha, Nebraska. That tip was forwarded to local law enforcement on August 6, 2025. The tip, which is anonymous, reports trafficking is happening at the "Inn and suites omaha near zoo was American inn but they have several hotels. New Victorian Inn." TARGET PREMISES #2 is near the Omaha zoo. In the space relating to Traffickers Info, the tipster wrote "Ken Chad and

His wife owners of the hotel." And in the space for the trafficking assessment, the tipster wrote "They make their employees work 7 days a week 12-14 hour shifts. They use coercion and fake promises of money a room or permanent employment to get homeless or Vulnerable persons to do laundry, work outside, repairs on and in the building." The tip goes on "The front desk person ███ told someone last night she was a minor. she works 7 days a week 12-4. The head of Housekeeping ███ and her boyfriend ███ did maintenance, Housekeeping, of the whole hotel 75 rooms, all of the laundry but only paid here for a few hours a day. Some times they would work 18-20hr straight.  She has no family or friends in the area, no transportation, or a home ███ hersel and her son was living at the hotel. Now they face homelessness because they fired her for leaving the hotel for half a day and having  some one come visit her."

58.       The tip also notes the signaler was unwilling to be contacted by law enforcement and the hotline was unable, when contacted, to provide any information about the tipster to law enforcement. Investigators with this case reached out to at least one source, who confirmed it was not the source making the report. At this time, the tip appears to be from a party at this time unknown to the investigative team.

59.       The former employee described on one occasion finding a box full of scanned copies of hotel customers' driver's licenses in a closet behind the front desk at TARGET PREMISES #2. The former employee said that was not allowed and was not proper protocol for the hotel industry.

60.       I know from training and experience that people who are in the United States illegally may use legitimate driver's licenses obtained in a misleading manner in order to represent themselves as having status in the US.

25

61.    The former employee believed that trafficking was not limited just to employees of the hotel, but also workers that Ken hired to do construction, remodeling, or repairs on the properties. The former employee told investigators of times construction workers at the properties would come to the former employee and ask him to call the police on their behalf, because they were working non-stop and not being paid. The former employee described it as them saying "help, I'm being trafficked!"

62.    During the course of the investigation, the team has learned that Ken frequently hires aliens to work construction at the hotels. Those individuals stay at the hotel but are not compensated for their work.

63.    On July 30, 2025, officers with the Omaha Police Department conducted a traffic stop on a vehicle being driven by Amit. Eudis Enrique Cuellar-Martinez was a passenger in the vehicle. During the course of that traffic stop, officers received consent to search and located approximately $5,000 in cash in the center console of the vehicle and a controlled substance, Khat, in the vehicle as well. Both Amit and Cuellar-Martinez were arrested. Investigators were able to interview Cuellar-Martinez at the jail.

64.    Cuellar-Martinez advised that he entered the United States in approximately January 2025 and was taken into immigration custody immediately after crossing into the U.S. Cuellar-Martinez advised that he was transported to an immigration camp in Denver, Colorado and then released until his immigration court hearing in Chicago in April of 2026.

65.    Cuellar-Martinez would eventually take a train to Omaha, Nebraska looking for work opportunities as a construction worker. He told investigators he learned about a job working as a laborer at TARGET PREMISES #2 from a friend. But after 8 months, Cuellar-Martinez left to go back to Denver because he was not getting paid from either Ken or Amit.

26

66.     In approximately May 2025, Cuellar-Martinez came back to work for Amit and Ken at TARGET PREMISES #3. Cuellar-Martinez advised he was to be paid $1,500 per room that he painted or fixed. Cuellar-Martinez told investigators that both Amit and Ken knew Cuellar-Martinez had no papers to legally be in the United States or work in the United States. After the first paycheck, Cuellar-Martinez reported he was never paid again, despite asking Ken, Amit, and Rashmi multiple times about getting paid.

67.     Cuellar-Martinez advised that he was living in room 419 on the fourth floor of TARGET PREMISES #3. He noted that there were two other undocumented Venezuelans living and working at TARGET PREMISES #3 with him, also living on the fourth floor.

68.     Cuellar-Martinez advised he rarely leaves the hotel unless he is traveling to TARGET PREMISES #2 or #4 to fix or paint something. He would occasionally walk to Walmart to buy a large bag of rice for food – since he is not being paid, he does not have much money for food and Cuellar-Martinez explained this is mostly what he eats. Cuellar-Martinez advised he does not eat the breakfast provided at TARGET PREMISES #3 because he does not know whose hands have touched it.

69.     Cuellar-Martinez reported in addition to himself and two other labor workers at TARGET PREMISES #3, there are six large families living at that hotel, at least two of them on the fourth floor. He also believed there were two Indian families living at TARGET PREMISES #4 and was specifically aware of the family brought from North Carolina having been at that location.

70.     Cuellar-Martinez advised he felt he could not say no to Ken or Amit when assigned a task. A previous worker had said no to Ken and Amit in the past and he was fired and sent back to his home country, per Cuellar-Martinez. The investigative team has not been

able to verify if this person was deported because of actions taken by Amit and/or Ken, or whether he left of his own will.

71.    Cuellar-Martinez advised that Amit would drive Cuellar-Martinez to go get supplies from a hardware store so he could do his work. He advised at the time of the traffic stop; Amit was driving Cuellar-Martinez to Home Depot to purchase supplies.

72.    A maintenance man at TARGET PREMISES #1 has been approached by law enforcement and has been providing information to the Sarpy County TFO. That individual has indicated that there are a lot of people who appear to be of Indian descent working at and then moving through TARGET PREMISES #1. The source, who also works in the hotel, reported that he is no longer attempting to learn people's names unless they stay there at least a month because there is so much human traffic in and out. The source has also reported that the manager at that hotel, who law enforcement has identified, has confided in the source if "ICE" shows up, he is going to run and that he is afraid of being deported. The manager at TARGET PREMISES #1 lives at the hotel and the source has reported that the manager has frequent contact with Ken.

73.    The maintenance man at TARGET PREMISES #1 also reported that Amit lives at TARGET PREMISES #1. Amit resides in a living space/apartment which has been identified as being on the subfloor level of the motel, on the east side. According to the maintenance man, this space was remodeled essentially to Amit's specifications and includes a hot tub. The maintenance man also said that professional remodelers were hired to re-do the area, and it was not done by the maintenance man himself or any of the other typical hotel employees or guests typically used to clean, paint or otherwise update rooms. The maintenance man reported that Amit would come back to stay at the living space, even though was working in

other hotels.

74.     At this time, as noted above, the investigative team believes that Matt is currently in Georgia, managing a hotel there in the same manner and means – that is through forced, alien, labor – as run in Nebraska. Prior to be moving to Georgia, Matt worked at and was seen by sources at TARGET PREMISES #1-4. He was involved in their day to day management and appeared to have a supervisory role over other employees, including the employees who did not have legal status.

### Scheme to Defraud the United States out of U Visas through Staged Robbery at a Brow and Lash Salon

75.     In addition to TARGET PREMISES #1-4, law enforcement is aware from open-source reporting that Ken and Rashmi own multiple Brow Bars and Brow and Lash salons, TARGET PREMISES #5-8.

76.     Law enforcement officers have visited every single place listed in TARGET PREMISES #5-8 in an undercover capacity, to observe how they operate and to document who is working there. Officers have been able to take pictures of multiple women working at these salons and have been able to identify some of them. All of the women working in these salons appear to be of Indian descent.

77.     Law enforcement has also been able to review records from the Nebraska Department of Labor related to the brow salons. Those records show two to three women working in the salons each quarter in addition to Rashmi. Of the multiple women who have been observed in the salons, only three of the women in the salons have been listed in the Department of Labor records.

78.     Law enforcement has also conducted multiple surveillance operations on TARGET PREMISES #1-8.

29

79.    Officers have observed on multiple occasions, on what seems to be close to a daily basis for the last four to six weeks, women leaving the TARGET PREMISE# 3 in vehicles registered to Ken in some capacity and being driven to TARGET PREMISES #6, 7, and 8.

80.    Officers have also observed a woman leaving on what seems to be close to a daily basis for the last four to six weeks, TARGET PREMISE #4 in vehicles registered to Ken in some capacity and being driven to TARGET PREMISE #5.

81.    Law enforcement believes that Ken and Rashmi have attempted on multiple occasions to secure visas or other immigration documents that would allow them to stay — permanently and legally, in the United States.

82.    In reviewing alien files (A-File), the investigative team saw that Ken was previously denied spousal visas because of concerns of marriage fraud, and also denied a visa meant for victims of human trafficking.

83.    The investigation team believes that in an attempt to get Rashmi status to remain in the United States through a U Visa application, Ken worked with a long term renter and employee of TARGET PREMISE #3 to plan a robbery on a Brow and Lash location owned by Ken and Rashmi so that Rashmi would be able to use the staged crime as a basis to seek a U Visa from the United States government to give her status to stay in the United States. A U visa is a visa that grants some temporary status to an alien who is otherwise unlawfully present so that the alien may participate in an ongoing criminal investigation and court proceeding in the United States. The U Visa, if awarded, prevents the alien from being deported during the pendency of the criminal investigation.

84.    The robbery that Ken arranged with the co-conspirator, known to investigators.

30

occurred in 2022.

85.     In reviewing reports and court filings associated with that case, on December 12, 2022, a robbery was reported at the Brow Beauty Salon located at 602 South 72nd Street in Omaha. It was reported that a male dressed all in black entered the salon with a firearm, demanded money, and physically assaulted an employee who was transported to the hospital. That employee was identified as Rashmi.

86.     Ken arrived at the hospital and was identified as both Rashmi's husband and the manager at the business.

87.     Rashmi advised that she was in the process of closing the store when a male walked in and produced a black and gold handgun. She reported the man said, "just give it to me all the money" and came towards her. She said she gave the suspect the money in the register, and he began pushing her arm and eventually pushed her down to the ground while demanding more money, before running out of the store.

88.     Officers reviewed CCTV footage from Brow Beauty and a neighboring business and were able to locate a suspect, however they were not able to tell if the suspect was male or female or otherwise identify the suspect.

89.     On January 4, 2023, an anonymous Crime Stoppers tip was received which stated the robbery at Brow Beauty Salon was orchestrated by the owners of the salon who also owned the New Victorian. The tipster further reported that Seth Miles was the person who robbed the Brow Beauty and that Miles was employed at New Victorian. Finally, the tipster named two individuals who had knowledge about the robbery. A second Crime Stoppers tip with generally the same information was made on January 20, 2023. That same day, two individuals were arrested on unrelated warrants at the New Victorian. Both individuals stated

that Miles had told them the owner of the hotel and Brow Beauty paid him money to rob the store.

90.    An arrest warrant for conspiracy to commit robbery was drafted for Miles and he was arrested in February 2023 on that warrant. Miles was arrested and agreed to an interview. In the interview, Miles admitted to being paid $1,000 by Ken to commit the robbery. He advised that Ken approached him before Thanksgiving, and they discussed conducting the robbery. Ken told Miles that a gun had to be shown and the victim had to be pushed so she would go to the hospital. Miles also provided officers with a thumb drive which had a recording of Miles and Ken discussing the robbery, including what happened to the clothes and gun used during the robbery. Ken also tells Miles in the recording he has contacts in Des Moines, Iowa and that Miles should go there until things calmed down in Omaha.

91.    Ken was interviewed in February of 2023. During the interview the officer noticed similarities between Ken's voice and the voice purported to be Ken's on the flash drive and Ken was arrested for conspiracy to commit a felony.

92.    Ken was eventually found guilty of attempted insurance fraud in Douglas County Court.

93.    Based on this "robbery" Rashmi submitted an application for a U-Visa.

94.    Rashmi, the investigative team found, filed another application for a U-Visa in May of 2025.

95.    In that application, the certifying agency was the West Valley, Utah, Police Department.

96.    I contacted West Valley Police Department and was able to get their records regarding the crime leading to Rashmi's report.

97.     Per police reports, on September 10, 2024, officers with the West Valley Police Department responded to a residence in regard to a reported sexual groping. The victim, who was identified as Rashmi, was transported to the hospital with a cut.

98.     Officers spoke with Rashmi's friend who reported that Rashmi had been living at her friend's house for a short while. At the time of the assault, Rashmi was carrying groceries into the house from the car. While Rashmi was at the car, her friend, who was inside, heard screaming from the front yard. Rashmi reported to her friend that an unknown male had come up behind her while she was outside, grabbed her by her breasts while positioned behind her, threatened her, and cut her army before leaving in a white vehicle.

99.     Rashmi had two lacerations on her right arm. Rashmi reported that she was bringing groceries inside and had gone out to get the second load. While at the trunk of the car, the someone suddenly grabbed her from behind, reached around and grabbed her by her breasts. She reported the male called her a "bitch" and told her "Not to scream or I will kill you" and then sliced her arm twice before fleeing in a white vehicle. Rashmi reported she believed the male to be African American based on the sound of his voice, reported he had curly hair and was dressed all in black. DNA samples were collected from Rashmi's clothing.

100.     In October 2024, West Valley Police Department attempted to re-interview Rashmi. She advised that she was currently in Houston and would not be coming back to Utah for some time, so a phone call interview was conducted. Rashmi stated that she was getting groceries out of the car when an unknown male jumped out of a white truck. Rashmi reported her head was in the trunk of the car as she was retrieving items from the trunk. The unknown male came up behind her and grabbed her breasts from behind and started touching all over her body. She stated the male then placed his hand over her mouth and then cut her arm. She

stated the male was black and appeared to be younger and that he had curly hair and was dressed all in black clothes.

101.    On December 12, 2024, West Valley received a U-Visa request on behalf of Rashmi which they certified, after finding that the Rashmi was the victim of a qualifying crime and cooperative with the investigation.

102.    On December 16, 2024, a West Valley officer called Rashmi, trying to get a buccal swab from her husband Ken as the crime lab was requesting a buccal swab from Ken eliminating him from the DNA testing being conducted. Rashmi told the officer she and Ken were still out of state and would not be back in Utah until January 2025 but would arrange a time to get a buccal swab when they were back in Utah.

103.    On January 8, 2025, law enforcement called and spoke to Ken about getting a buccal swab. Ken stated he was out of state but would possibly be in Utah the following week.

104.    Ken never did come in for a swab. Per West Valley's reports, "all avenues have been exhausted and no suspect has been identified" and the case is closed.

### Sex Trafficking Conspiracy and Obstruction of Sex Trafficking

105.    In January of 2025, a joint Homeland Security Investigations (HSI) and Omaha Police Department (OPD) investigation was conducted into commercial sex acts occurring at TARGET PREMISES #2 involving two minor females.

106.    The results of that investigation have thus far led to the arrest of six adults and the recovery of two minor victims who had been forced to engage in commercial sex acts.

107.    Three of the adults arrested were employees of TARGET PREMISES #2.

108.    Neither minor victim spoke English, so both were interviewed in Spanish, their primary language. They both advised that they were brought from out of state by a trafficker and forced to engage in commercial sex acts.

109.    Both minor victims disclosed they were required by their trafficker to engage in sex acts with employees of the hotel in order to rent or keep rooms rented that their trafficker used for them to engage in commercial sex acts with others in. The victims believed the employees were aware of their trafficking and noted that their trafficker charged hotel employees less than other buyers to engage in sex acts with them. At least one victim believed hotel employees took steps to help their traffickers avoid law enforcement detection, such as deleting surveillance video footage or at least not turning it over to law enforcement.

110.    Following the arrest of the three employees as a result of the human trafficking investigation done by HSI-OPD, the previously mentioned maintenance employee at TARGET PREMISES #1 put $250 in cash on each of the three men's jail fund accounts. An interview with that maintenance employee confirmed that Ken had directed him to do so, telling the maintenance employee the three men were, per Ken, "just looking to get laid and in the wrong place at the wrong time."

111.    From interviews with the three employees arrested, it is my understanding the money used to purchase the commercial sex acts came from the hotel till. In other words, the hotel paid for the employees to engage in commercial sex with children.

112.    I have seen a picture of the two minor victims of the sex trafficking. It is, in my opinion, immediately obvious that the two victims are minors. Additionally, I know from discussing the case with law enforcement officers involved that several people commented on how young the minors looked – including potential sex buyers who backed out upon seeing

their pictures, citing age concerns and the as of yet unknown suspect who posted online

commercial sex act ads featuring the victims.

113.    The Sarpy County TFO working this case is familiar with another human

trafficking of a minor case involving Rolando Midder and has shared details about that case

with me. Midder was arrested at the end of June 2022 on a federal complaint for sex

trafficking a minor.

114.    That Sarpy County TFO had a source living at TARGET PREMISES #3 in June

of 2022 that aided law enforcement in identifying and arresting Midder and recovering the

minor victim of his trafficking. The recovery of the minor female took time, as she was

untrusting of law enforcement and took steps to evade them. When the minor female victim

was located, she fled law enforcement while high on methamphetamine into TARGET

PREMISES #3. She was able to access a room which was later searched and identified as

belonging to two live-in employees of the hotel.

115.    In early July 2025, investigators interviewed another woman who had stayed or

lived at TARGET PREMISES #1 off and on from 2019-2022 and at TARGET PREMISES #3

in 2022 – 2023.

116.    That woman advised she had personally exchanged sex for rooms on about a

dozen occasions in 2022.

117.    She admitted to having engaged in prostitution while staying at the hotels, but

denied being trafficked.

118.    She advised investigators that Matt would text her when a law enforcement crime

bust was happening, would book her using fake names or off the record, so that law

enforcement would not know she was there. She also said that Matt would direct sex buyers to

her and she had several regular clients that Matt had introduced her to. The Sarpy County TFO reported that before this woman began cooperating with law enforcement, she had been sought by the Metro Fugitive Task Force. The fugitive task force went to TARGET PREMISES #3 specifically looking for this source, and presented Matt with a photo of the source. Matt denied knowing the source. Undercover task force personnel entered later and again asked for the source by picture, but posing as commercial sex buyers. Matt then directed them to the source's room, where she was apprehended and became a law enforcement cooperator at that time.

119.    The former employee who was arrested on a failure to appear charges and interviewed by agents in the Sarpy County jail also discussed human trafficking, particularly of minors, occurring at the hotel.

120.    He advised that on one occasion at TARGET PREMISES #1 he heard the front desk worker at the hotel tell a woman that she had to suck his dick or he would kick her out. The woman, per the former employee, did perform oral sex on the front desk worker, but he still kicked her out.

121.    The former employee disclosed that he was personally solicited by what appeared to be an underage female of Indian heritage asking if he would pay her to perform oral sex on him. When he identified her as underage, he reported that the took her to the room where her male relatives were staying and advised them what she was doing. The man who identified as her father asked the former employee if the girl did perform oral sex on him if they could get a free room out of it.

122.    The former employee told agents during the interview that there was one room on the second floor of TARGET PREMISES #3 that fell within a blind spot for the surveillance

37

cameras. This room was specifically used for prostitution and the surveillance camera was specifically moved to create the blind spot. Investigators were able to later identify this as room #210.

123.    The former employee believed that this was so wives, like Rashmi, who could access the surveillance video on her phone, could not see who was engaging in sex acts at the hotel.

124.    I know that during the human trafficking investigation in January of 2025, the minor victims reported going to a different room at TARGET PREMISES #2 if the sex buyer was an employee of the hotel. That room per their report and phone records, was room #210.

125.    The former employee also recalled an incident when another male, who was related to Ken, was groping boys in the public areas of one of the hotels. Ken was notified, and refused to intervene, leaving it to the former employee to make the man stop.

126.    As part of this investigation, I and other special agents interviewed a woman serving a sentence in Washington County, Nebraska. That woman advised she had previously stated at TARGET PREMISES #3 and called it "the worst hotel I've ever been to."

127.    She was familiar with the former employee, discussed above. She advised that prior to leaving for Georgia, the former employee had messaged her stating they needed to show her something. She met with the former employee at TARGET PREMISES #3. He showed her a video on his phone. That video was of herself being sexually assaulted in room 418 or 422 of TARGET PREMISES #3. The former employee told the woman that the video was also on an unknown pornographic website. The female told investigators she had not consented to the sex act, had said "no" numerous times during the act, and did not know much

38

less consent to the video being taken, much less shared. The former employee also had similar videos from cameras in the hotel in Georgia.

128.    The woman described this video as though it was being taken from across the bed, and not from above, like the camera was in the furniture, specifically the TV area and not in the ceiling. She believed the video had audio. She remembered this sex assault and believed it had occurred in 2024.

129.    The former employee did not disclose this incident in his interview. However, he did make a comment that he would feel better if law enforcement had access to the hotels surveillance systems.

130.    The female at Washington County further advised investigators that she had been propositioned to have sex with Matt multiple times while he was working at TARGET PREMISES #3. When the woman declined, Matt "banned and barred" her, telling her that she would not be allowed to rent a room in her name at the hotel since.

131.    The woman went on to tell investigators that TARGET PREMISES #1, 2, and 3 are all used for prostitution, and that she personally knew multiple girls who worked out of these properties. Staff at TARGET PREMISES #3 knew prostitution was occurring and would ask the male buyers entering the hotel for sex who they were there to see and provide the room number for the buyer where the sex worker was staying.

132.    I am also working with a source who also owns commercial hotel properties and is also active in the Indian community in Nebraska. This source has shared with me that they have had conversations with Ken about sex trafficking occurring on his properties and that he needs to stop it as it is immoral and against his culture. Ken, per the source, has brushed off these concerns.

133.    In March of 2024, Wyndham Corporate sent a letter to Ken, voicing concern that he had permitted criminal activity to occur in his hotels, possibly harming the Wyndham brand name. In his response to that letter, Ken took issue that they were implying that "either I or a member of our staff turned a blind eye to criminal activity on my property." He stated that was not the case and blamed any concerns about criminal activity occurring as "undesirable hotel guests" because of certain hotel locations. He specifically noted he had completed training regarding identifying signs of potential human trafficking.

### Maintaining, Managing, and/or Using a Premises for Drug Trafficking

134.    TARGET PREMISES #1-4 are known to be hotbeds of drug dealing and drug use.

135.    Investigators met with a woman currently incarcerated at the Douglas County Detention Center on unrelated matters. She was asked about her experiences at these hotels. She spoke of her personal experiences at TARGET PREMISES #4 and advised that "they don't give a fuck about anything illegal." When asked if management was aware of drug use taking place at the hotels, she advised her boyfriend had personally smoked methamphetamine with the manager of the hotel in the manager's room.

136.    The woman who had been interviewed in early July 2025 also spoke to investigators about drug trafficking occur in the hotels. As noted previously, she had stayed or lived at TARGET PREMISES #1 off and on from 2019-2022 and at TARGET PREMISES #3 in 2022 – 2023.

137.    She also advised that a drug dealer she knew as "Big E" would give Matt money to turn a blind eye to his drug dealing activities. Matt would log him in under a false identity

or run interference for Big E with law enforcement. Rolando "LaLa" Midder was supposed to have a similar deal as well.

138.    Law enforcement was able to identify "Big E" as Eric Colclasure. Colclasure was federally indicted in the District of Nebraska and ultimately sentenced to 210 months with the Bureau of Prison on drug and gun charges.

139.    This source advised officers that she personally knew Matt, and most of the Indian men living and working at the hotel, to use/chew "Khat". Khat is a schedule 1 controlled substance and is an amphetamine like stimulant.

140.    Per multiple sources and interview subjects most of the male targets and male Indian family within this investigation and staying at TARGET PREMISES #1-4 consume Khat on a daily basis. This claim has been substantiated by physical surveillance and video surveillance conducted at TARGET PREMISES #1-4. In past interviews when asked, sources are uncertain where the Khat comes from. One source believed it was purchased in bulk by the family members on site due to the fact they consistently saw the male Indian staff chewing it, never going without.

141.    There have been multiple mentions of a male "Sunny" that would openly partake in the meth usage with other patrons at New Victorian.

142.    A third woman was interviewed by law enforcement, in late July. This source described the hotels owned by Ken and Rashmi as locations preferred by prostitutes, narcotics dealers, fugitives and others engaged in criminal activity because the hotel employees and owners "do not care what you do, as long as you pay for your room," and added, "Not paying is the only reason they will kick you out." This source had personally been a long-term resident at TARGET PREMISES #3 for over a year between 2022 and 2023. They had also

spent time at TARGET PREMISES #1 and TARGET PREMISES #2 during the last few years when Ken was operating all locations.

143.    The informant stated that the hotel employees were careful to segregate known criminals from paying guests.  The informant believed that staff knew who was involved in prostitution, who was a fugitive, and who was a drug dealer.

144.    The long-term resident informant was personally solicited by Matt to steal goods, to include high-end household appliances and name brand clothing for the hotel's benefit and also for Matt's personal benefit.  The long-term resident informant would occasionally be taken to Ken's house in Elkhorn to sell these stolen items with the requirement that the long-term resident informant "dress nice."

145.    This same long-term resident informant sold many pounds of methamphetamine from the hotels while staying at them. The informant believed that "Matt" was aware of the informant's drug distribution This belief was based in part on the long-term resident informant's perception that Matt was aware of all of the traffic from people coming to buy drugs from the informant in his room. Matt never asked any questions about why so many people were coming and going from the informant's room. Matt was around to observe the traffic from the informant's observations.

146.    This same long-term resident informant was aware of a drug trafficker who goes by "Big E" (Eric Colclasure) who lived at off-and-on at TARGET PREMISES #3 and had an agreement with Matt where "Big E" would get to reserve two rooms, one under a fake name or registered in a way that would make it more difficult for law enforcement to locate "Big E" if they followed or tracked him to the hotel. This informant was aware of times that "Matt" would lie to law enforcement or take obstructive efforts to prevent law enforcement from

locating individuals who were of interest in ongoing investigations.

147.     The informant was also aware of drug overdoses occurring at the hotels.  The
front desk staff at TARGET PREMISES #3 were provided with a Narcan kit to keep on hand.
The informant knew that "Matt" was specifically aware that Narcan was kept on site.  The
informant stated that motel staff would not call emergency services in the event of an
overdose, and the informant was at TARGET PREMISES #3 for multiple overdoses including
a fatal one. The informant was aware that the staff were not concerned about the guests but
presumed that law enforcement was not called to prevent law enforcement detection of the
drug trafficking and use occurring at the motels/hotels.

148.     The former employee reported that after a year of working at the hotels, he
stopped booking in "normal" customers and would attempt to encourage tourist families who
arrived at the property to stay elsewhere.

149.     In corroboration of the presence of criminals at the hotel, one online review for
TARGET PREMISES #2 indicated that multiple warrants were being served during the
guest's stay:



Lyndsey J Draw a box to comment                                                                1/5

Cops, Marshalls & local police there, numerous times, serving warrants over my 2 night stay in
the middle of the week. No power for over 5 hours at night my 2nd night there! No lights in
parking lot, rooms, or anywhere! Hotel did not accommodate any body in any way for the power
outage  No generator  People all over the halls & parking lot @ all hours of day and night

150.     The long-term resident informant added that motel staff take advantage of many
of the drug users on site as forced labor, knowing they have no other options they "hire" them
as housekeeping or maintenance workers and are not paid, but given free rooms in exchange

for their work. This work is often around the clock and those "hired" were never given a day off. This matches information gathered from other interviews and sources interviewed over the last 3-4 years by investigators. Investigators have also spoken directly to some of the individuals who experienced these working conditions firsthand, and their accounts were consistent with that of the informant as to the working conditions and the terms of the "employment."

151.    Among the online reviews of these locations documented by the investigative team, were some reviews that commented on the open and apparent narcotics activity at SUBJECT PREMISES #2 based on reported observations of guests who stayed at the location in the last year:



**Torque**
7 months ago on 🅿 Priceline ☑                                    **2/10**

+ Near downtown
- Overrun by drug addicts loitering all over the property



**Eric A**
9 months ago on Ｇ Google                                         **1/5**

Vacation  Solo

Did I book a room in a crackhouse? This is the worst hotel I've ever seen  I checked in, went to my room, took one look, then went back downstairs for a refund. There's crackheads tweaking outside, guys drinking 40s in the staircase, garbage and equipment everywhere, and overflowing trash. He said he'd refund my $85 but only refunded $3  I called and he said he would refund and then hung up on me, i don't see my refund. This is crazy, how are these people still in business?

Rooms  1.0    Service  1.0    Location  1.0
Safety  Did not feel safe at all                                    •••

## The Inn&suites Omaha Near Zoo

☐  ✕ Close

Overview    Prices    [Draw a box to comment]    Photos    About

Vacation I Family

Family owned business with some serious issues.
At check in I was provided a key to a room where someone was still staying in.
Daytime desk staff does not have complete command of local language. Customer before me was checking out a day early and requesting a partial refund. Desk clerk could not understand the request so the customer left angry.
I requested a do not disturb sign or a note added to my check in, was handed a piece of printer paper.
No ice machines, parts of hotel clearly incompletely repaired.
Half of electrical outlets in our room did not function.
Could not sync tv remote to tv, could not connect to wifi for more than a few minutes as wireless hub in hall kept powering off.
Bathroom sink has permanent stains in the porcelain.
The glue holding down the floor laminate was leaking through the floor paneling and got on bottom of my shoes
Strange occurrences, like we saw someone pry open a window and launch themselves into a room on first floor.
Noted that there was someone sleeping in hallway for majority of night.
As we were leaving the stairway door started to close and there were a number of used hypodermic needles hidden behind the door.
The location is great but would be concerned about staying here if you have small children or are travelling alone as there are some obvious security concerns

152.    Similar reviews referencing drug use at TARGET PREMISES #1, #3, and #4

were also found and documented online.

153.    Reviews from TARGET PREMISES #1 include the following:

 May 2023   •••

### Horrible never stay there

Run- runaway from this place- great place for drugs and prostitution. They even try to cancel your reservotian hours prior to arrival. I wish I would have just let them cancel me yet I fraught to stay because everything last min was way more money. Knowing now if I would have know then - I would have paid it to stay away from there. I think he was trying to do me o favor.

Review collected in partnership with this hotel ⓘ

    Jun 2022   •••

### Filthy. Boogers on sheets.

This hotel should be condemned. The sheets had clearly not been washed and there were dried boogers wiped all over the sheets. We saw two prostitution transactions and witnessed a drug deal in the parking lot. We refused to stay there because of the filth in the room, but the manager would not refund us. The room cost 300/night because of the college World Series being in town. Worst hotel experience I have ever had.

    Jun 2022   •••

### A pit

Worst hotel I have ever stayed at in my entire life throughout the world of my fifty five years of traveling - no redeeming qualities among any category I could select - my strong advice, sleep in your car or try to get arrested so you can enjoy a clean jail cell instead of what this place offers.

154.    As it pertains to TARGET PREMISES #3

 **Aaron Martin**
a month ago on G Google

2/5

Worker has been asleep every time I went down to the desk

Service  1.0                                          •••



Response from the owner
a month ago

Dear Aaron Martin,

We apologize for the unprofessional behavior you encountered. This is not the level of service we aim to provide. We will address the matter with our staff immediately. Thank you for bringing it to our attention.

Thank you...



**Ross Packett**
a year ago on G Google

1/5

Owners just use this crack house looking hotel to launder money. Owners wife had pure intentions but unfortunately has brain cancer so she isn't aware of much going on. This place is a health nightmare and should be condemnd. If you value your life at all please sleep elsewhere. Rather it be in your car, under a bridge or near a creek. Still safer.

Rooms  1.0    Service  1.0    Location  1.0    •••

Response from the owner
a year ago
sorry

155.    As it pertains to TARGET PREMISES #4 the reviews include:



**JM**
a year ago on G Google

1/5

feels like a homicide is imminent if it hasn't already happened... it's giving serious meth lab vibes dirty sheets / flies abound / doors that don't open from the inside (free escape game!) / filth everywhere

Rooms  1.0    Service  2.0    Location  3.0    •••

47



**Erica DeRycke**
2 weeks ago on G Google

Vacation  Couple

This was one of the dirtiest hotels I have ever been to. As an extended stay I was expecting less than pristine conditions but this was deplorable. It was dirty all around with piles of garbage and broken items through the building and parking lot. When we arrived we were told that the air conditioner wasn't working and were offered a new room but not with a spa tub. We opted to stay in the original room as it wasn't super hot out. There were several issues besides the air conditioner being out. The lamp was missing a light bulb, the remote was missing batteries & there were no towels anywhere in the room. We went and asked the attendant about these things and he promptly fixed the issues. Later that night we noted that the air jets in the tub didn't work and someone before us had spilled something orange in the freezer and no one had cleaned it up. The only bright spots I can give are that the attendant was friendly and did what he could to address our issues and the room itself was mostly clean and bug free.

Rooms 1.0     Service 3.0     Location 1.0                                              ...



156.    As noted previously, Amit was stopped on July 30, 2025. At that time, Khat was found in the vehicle.

157.    A confidential informant notified investigators following the above traffic stop that people at the hotel were talking about Amit getting stopped by the police and arrested along with a Hispanic construction worker who has been on site at TARGET PREMISES #3 doing renovations. The confidential informant indicated there was an increase in activity at the hotel following the arrest.  Specifically, the informant indicated Ken and Rashmi arrived at the hotel and began deleting security camera footage from the security system, very early in the morning, like around 1:30am.

## Information About Surveillance Systems

158.    There are surveillance systems throughout TARGET PREMISES #1-4.

159.    Agents and the Sarpy County TFO have been to TARGET PREMISES #1 and observed security cameras in both interior and exterior locations.

160.    Officers with OPD have recovered surveillance camera video from TARGET PREMISES #2 as part of the January 2025 sex trafficking investigation.

161.    The loan officer notes for TARGET PREMISES #3 specifically note that "the property is monitored with multiple external and internal closed-circuit cameras so that the attendants can observe all sides of the property 24 hours per day. The sponsors have the ability to remotely monitor the property through their cell phone as well."

162.    Amit has shown investigators footage from the hotel surveillance system to OPD officers.

163.    Finally, TARGET PREMISES #4 has also been observed by agents to have security cameras inside and outside the premises.

164.    Investigators in the January 2025 sex trafficking case received consent to search on of the arrested employee's phones. In searching that phone, there were still shots that appeared to be from hotel surveillance systems sent by Rashmi to the employee. At least one of the shots shows the interior of the hotel and the other shows the exterior.

165.    The long-term employee referenced throughout this affidavit indicated that the women staying at the hotel, assumed to include Rashmi would watch the hotel surveillance video footage like it was the equivalent of a daytime soap opera.

## Facts Pertaining to Mahesh Chaudhari

166.    As referenced throughout this affidavit, this conspiracy involves multiple locations and businesses, throughout the United States. The investigative team has

developed probable cause that it also spans across Nebraska and is not just limited to the Omaha, Nebraska area.

167.    The investigation has revealed that Maheshkumar Amrutlal Chaudhari (Mahesh) was an employee and apprentice of Ken's. According to the previously referenced source who is also in the hotel industry, Mahesh learned the hospitality business from Ken.

168.    This entire investigation started on my end about call centers. The hotel source alleged that individuals with Indian ties came from Brazil to the United States. They began working as money mules. The scams would involve calls being made from a call center, believed to be in or at least have ties to Gujarat, India. The victims would be randomly called by the call center by scammers posing as employees with a government agency. The victims would be convinced to withdraw cash from their bank accounts and physically hand off the cash to an individual in a person to person transaction. The source told me that the money mules for these scams were living or at least staying in hotels owned by Ken.

169.    In March 2025, alleged scammers posing as employees of the Federal Trade Commission (FTC) told the victim, that the victim's computer had been hacked, and personal information had been compromised. The scammers subsequently collected a total of $84,000 (two incidents of $52,000 (3/14/2025) and $32,000 (3/17/2025) from the victim who placed the money in a shoebox, then placed the shoebox in the back of the scammers' vehicle. The two subject were driving a Honda Odyssey Van which three other vehicle license plates in the back seat along with disguise items such as COVID Face mask, sunglasses, and hat. The scammers were arrested and identified as Dishaben Nareshbha Patel and Amit Patel.

170.    According to the industry source, Mahesh and Dishaben are close relatives.

171.    On May 15, 2025, an FBI SA reviewed the phone seized from Amit Patel as a result of his arrest. The review was conducted pursuant to a search warrant for the device.

172.    The search of the phone also revealed that the previous number associated with that phone was 1██████1502, which is believed to be Mahesh's current phone.

173.    There was a picture of a $7500 check from Dishaben's checking account to Mahesh's son. Based on information available to me, this son is approximately 10 years old. He was also born in Brazil.

174.    In approximately 2023, Mahesh moved to Norfolk, Nebraska with his wife, Sumitraben Chaudhari (Sumi), and two children, including the above referenced son. Mahesh lives at 402 Blaine St, Norfolk, NE. Mahesh, per the hotel source, was seeking to open multiple eyebrow salons across Nebraska.

175.    Mahesh opened two eyebrows' salons in 2024, one in Norfolk and one in Columbus. The source says Mahesh and Ken are partners in these businesses.

176.    Based on surveillance reporting, Mahesh leaves his residence on a regular basis and takes his wife, Sumi, to work at the brow salon located at 701 S 25th St #300, Norfolk, NE 68701. Mahesh also owns Brow and Lash located at 915 23rd St Suite 100, Columbus, NE 68601 in Crown Tower strip mall. Sumi, Mahesh's wife, overstayed a visa that expired in 2019.

177.    Mahesh drives a Black 2025 Nissan Pathfinder with NE license plate, JOGNI19. The Pathfinder is registered to Ketankumar B Chaudhari and Maheshkumar Amrutal Chaudhari at 402 Blaine St, Norfolk NE 68701. The Pathfinder is also titled in the names Ketankumar B Chaudhari and Maheshkumar Amrutal Chaudhari at address 402 Blaine

St, Norfolk NE 68701.

178.    As noted above, Mahesh currently operates with phone number ███ 1502.
According to toll analysis of Ken phone, Mahesh talks to Ken both on the phone and over
WhatsApp frequently. According to open-source searching, ███-1502 is registered to
address 2306 N 182ND AVE, Elkhorn, NE, which is Ken's current residence.

179.    According to open-source searching, Mahesh had a Washington driver's license,
WDL ███ 263B with address PO Box 3031, Kent WA, 98089. He was just issued a
Nebraska driver's license on July 22, 2025.

180.    Ken also has a current driver's license from Washington listing that same PO Box
address.

181.    There are currently at least three FBI cases investigating multiple individuals
linked to drivers' licenses with the address PO Box 3031, Kent WA, 98089.

182.    According to the hotel source, Mahesh was the "broker" of scheme to defraud the
US government by paying individuals to assault immigrants in order to apply for a U-
visa. Mahesh is "the mastermind of all the contacts in Nebraska and Iowa." Mahesh has
assisted in sending undocumented individuals to Washington state in order to receive
drivers licenses. Mahesh would make the arrangements to have illegal immigrants
transported to Washington for a few days and then transport the individuals back to
Nebraska. Mahesh was getting money orders sent to him via mail. Mahesh has been seen
with a large stack of what appeared to be money orders by the hotel industry source.

183.    The phone seized from Ken in 2023 and searched in this case resulted in messages
showing that Ken was obtaining driver's licenses from the State of Washington using a
contact in Washington and that workers from Nebraska were being transported to

Washington for that purpose.

184.    Based on sensitive financial information from 2023 and 2024 we know Mahesh

conducted six cash deposits in amounts ranging from $420 to $7,500 totaling $25,920

from an unknown source and deposited 12 money orders, totaling $9,750 at bank

branches located in Norfolk, NE and Omaha, NE.  Additionally, according to financial

account information, Mahesh residence at TARGET PREMISES.

185.    Phone records between Ken and Mahesh show Ken calling Mahesh as recently as

July 30, 2025, and 19 WhatsApp transactions between their two numbers between July

29 and August 4, 2025.

186.    Below are WhatsApp messages between Ken and a phone number ████-0415,

saved as "Louis WA License"

### 4 Nov 2022

Ketan: "5 guys from Nebraska will come
"They will send you their info asap"
"I'm two weeks"
"*in"
Louis: "Okay sir"
Louis and Ketan proceeded to have a conversation about a package being sent but was not
delivered to Ketan.

### 14 Nov 2022

Ketan: "Hello
Can you get me a new one this week?
My current one gets expired this Friday"
"Looks like it came back to you"
"Can you please overnight today via FedEx?"
"Thanks"
Louis: "Okay"
There was more communication about the package and Louis sent a confirmation of shipment
Both USPS receipts indicated the mail was shipped by Louis from Kent, Washington, which is
where Ketankumar's driver's license is from.

### 19 Nov 2022

Ketan: "Can you find and send a driver to Omaha for them?"
Louis: "Yes I talked to this guy. He said he charges 1000 for one person with everything
included"
"Idk if it will work for them or not"

Ketan: "They all pay 1000 together"
"Not per person"
"Is it per person?"
Louis: "Yeah that's what he said"
"Per person"
Ketan: "Ok let me tell them to find someone then"
"They will not pay per person"
Louis: "Ok"
Ketan: "Is 28th week works for you!"
Louis: "I'll confirm tomorrow with u"
"I need to talk with school guy"
Ketan: "Ok"

**8 Dec 2022**

Ketan: "What you have available"
"I got a driver"
"Anything after 25th"
"After Christmas"
"Because one guy have bday of his son"
Louis: "2nd week of January"
"13-14"
Ketan: "Hmm"
"It will be too late"
"Let's do December"
Louis: "Ok"
Ketan: "19th then"

187.     The former hotel employee told investigators that once, while he was working the front desk, an Indian family who was associated with Ken and Rashmi told him she was going to Washington state to get an ID. She said it was for school.

188.     In reviewing Ken's bank accounts, on March 31, 2024, one of Ken's bank accounts wrote a check for $8,4141.00 for Mahesh's wife. On that same day, Mahesh was also written a check for the exact same amount from the same account. In September of 2024, another check was paid from the same Ken account to "Clock Tower" with memo: "915 23rd St, Suite 100", which is the Brow & Lash salon located in Columbus that Mashesh owns. This would seem to indicate that Ken is involved in the operation of Mahesh's brow salons.

189.    According to sensitive financial data, Mahesh was involved in inexplicable international movement of funds, which appeared indicative of informal foreign third-party money remittance between September 3, 2019 and December 26, 2019. Those transfers totaled $1,104,033. I have seen nothing in the review of any bank records, source reporting, or electronic evidence collected thus far that would led me to believe Mahesh is involved in any legitimate business that would bring in that amount of cash in three months time. I have received services in an undercover capacity at the brow salons referenced as TARGET PREMISES #5-8, and have seen and reviewed the rental rates for the hotels/motels that make up TARGET PREMISES #1-4. The only evidence I have reviewed that appears capable of raising that amount of funds in that period of time is the trafficking of human beings, revealed in Ken's phone.

190.    Additionally, according to the Nebraska Secretary of State, there are no records filed for the Brow & Lash salon located in Norfolk or Columbus. Previously, Mahesh has reported on bank documents the salons are held as an LLC. This would be indicative of a shell corporation, which I know to be used by conspiracies engaging in money laundering and fraud.

191.    Outside of Ken, Mahesh is also tied into other known individuals involved in the hotel conspiracy. A search of Amit's phone, seized pursuant to his arrest on July 30, 2025, and searched pursuant to a federal warrant, revealed a WhatsApp group message entitled "Chaudhary brother's" which included, among others, Amit and Mahesh.



**Chaudhary brother's**

8 participant

Q Search

192.    There are also messages on the phone directly between Amit and Mahesh.

193.    And messages between Rashmi and Amit also reference Mahesh. One of the
conversations translated by a TFO was sent by Rashmi to Amit and, per Google translate
from Guajarati to English reads "then give all that stuff to Mahesh Bhai and he will take
it. Super8 container." This was sent on June 26, 2025.

194.    Records indicate that Mahesh is not in the United States legally. He appears to
have an asylum claim pending. Records also indicate that Mahesh's wife is not in the
United States legally, either, but has an asylum claim pending as well. This draws
parallels to attempts by others engaged in illegal activities, notably Ken and Rashmi, to
receive U-Visas, made available only to victims of certain crimes, to stay in the United
States. Like U-Visas, I understand asylum claims to be limited to certain facts. As
discussed above, three employees of TARGET PREMISES #2 were arrested in January
for sex trafficking. I was able to interview one of those employees and I am aware of the

other two being interviewed as well. It was disclosed at least one, if not two of the employees had pending asylum claims themselves, but when asked, could not explain why they were seeking asylum and voiced no fear about returning to their own country.

195.     Further, based on the totality of the circumstances, it appears that Mahesh plays an important role in getting and keeping people here to work, whether in brow salons or the hotels, by providing them with driver's licenses – a necessary tool for transportation, particularly in a state like Nebraska, which widely lacks public transportation. Identification documents. In some instances, it appears he physically arranges their travel to Washington to secure these documents.

**Training And Experience Concerning Labor Trafficking and Harboring Evidence**

196.     Based upon my training and experience investigating criminal matters, I know:

a. That large-scale alien harboring, concealing, and transporting organizations generate large amounts of currency from these illegal activities when the harboring is done for the purpose of private gain or commercial advantage and that these operations must have access to large amounts of currency to maintain and finance their on-going criminal operation.  Large-scale alien harboring and transporting organizations often conceal this currency in locations such as their residence, businesses, safe deposit boxes, safes, or other locations where assets can be concealed. These locations may be in the name of the alien harborer, or concealed in the name of relatives or close associates;

b. That in order to conceal profits from their alien harboring and labor trafficking, concealing and transporting organizations often purchase and/or title their assets in fictitious names. aliases or the names of relatives, associates or business entities to

avoid detection of these assets by law enforcement authorities. That seems to be the case here, where many of the LLCs are named incredibly similar – for example the names of the LLCs holding the hotels are Bapa Maharaj LLC, Maharaj Bapa LLC, Jay Maharaj LLC and Bapaji Maharaj LLC.

c.  That even though these assets are concealed under these other names, the alien harborers actually own and continue to use these assets, and exercise dominion and control over them;

d.  That it is common for alien harboring, concealing, and transporting and labor trafficking organizations to maintain books, records, receipts, notes, ledgers, airline, bus, and/or rental car tickets, as well as numerous vehicle purchase records, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, harboring, illegally employing, and concealing of aliens.  That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the alien harborers have ready access to them, including their residences, businesses, vehicles, storage units and/or other locations over which they maintain dominion and control. A search of Ken's cell phone showed multiple pictures of time cards for people working at various properties owned by Ken and Rashmi. There were also messages relating to wages, as well as talk about arranging rides for people, in some cases halfway across the country;

e.  That it is common for persons involved in large-scale alien harboring or harboring, concealing, and transporting and labor trafficking organizations to maintain evidence pertaining to their obtaining, secreting, transfer, concealment, and/or expenditure of illegal proceeds, such as: currency. financial instruments, precious

metals, and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements, and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, and money wrappers. These items are maintained by the conspirators within their residences, vehicles, businesses, storage units or other locations over which they maintain dominion and control;

f. That alien harboring, concealing, and transporting organizations often utilize electronic equipment such as cell phones, computers, telex machines, facsimile machines, text messaging devices, email, currency counting machines, and telephone answering machines to generate, transfer, count, record and/or store the information described above in furtherance of their illegal activities and to conceal their illegal activities. That has already been demonstrated in this case through searches of Ken and Amit's phones;

g. That alien harboring, concealing, and transporting organizations often attempt to legitimize their profits from their specified unlawful activities through various money laundering methods. To accomplish these goals, alien harborers and concealers utilize methods including but not limited to, domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations, and business fronts, and otherwise legitimate cash producing businesses;

h. That the currency transaction reports which are required to be completed and filed by financial institutions and businesses on every currency transaction which exceeds $10,000, causes tremendous problems for individuals engaged in alien harboring,

59

concealment and transport when they attempt to negotiate their illegal profits at financial institutions or businesses. In order to avoid the filing of a currency transaction report, these individuals often "structure" their currency transactions, that is, arrange a cash transaction exceeding $10,000 into smaller transactions so that no one transaction exceeds $10,000, or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency;

i.  That individuals who harbor, conceal, and transport aliens and traffic in labor at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other Federal, state, or local law enforcement agencies. In order to legitimize their spending, these individuals file tax returns reporting income commensurate with the amount of money they have spent during the year, which they feel, can be traced and documented by the government. The "source" of their income reported on these returns is usually falsely stated, misleading or generic in terms. Retained copies of these returns are commonly kept by these individuals in their residences and businesses;

j.  That individuals who are part of large scale alien harboring and concealing, and transporting and labor trafficking organizations commonly maintain cellular phones, computers, text messaging devices, books or papers which reflect the names, telephone numbers, addresses and/or electronic email addresses of their criminal associates and of the aliens who are being used to generate illegal proceeds and who are being harbored, concealed, and transported by the criminal organization. Again this is specifically seen in this case, through the reviews of phones belonging to Ken and Amit;

k. That individuals who are part of large-scale alien harboring, concealing, and transporting and labor trafficking organizations commonly house aliens in residences and locations owned and/or controlled by the members of the organization. These individuals also commonly employ these aliens at businesses and locations where members of the organization launder the illegal proceeds generated by the harboring, concealing, unlawful employment, and transporting of aliens.

l. That individuals who are part of large-scale alien harboring and labor trafficking, commonly take or cause to be taken photographs and videos of themselves, the aliens they employ, house, conceal, harbor, and transport and their associates, their assets and their product. That these individuals usually maintain these photographs and videos in their possession, or within their residences, computers, cellular phones, vehicles, and/or other locations over which they maintain dominion and control;

m. That individuals who are part of large-scale alien harboring, concealing, and transporting and labor trafficking organizations keep in their residences and places of business items that tend to identify the aliens whom they harbor, unlawfully employ, transport, conceal. This includes false identities that the criminal organization either provides to the aliens or tracks or uses to help conceal the alien's true identity and alienage. This identification evidence includes driver's licenses, state identification cards, photographs, birth certificates, certificates of marriage and divorce, immigration documents from the United States and foreign countries, passports from the United States and foreign countries, social security cards and records of social security numbers used by aliens to obtain employment illegally, alien payroll records, alien staffing records and agreements, employment paperwork required by federal law and

61

commonly referred to as an "I-9" document, tax returns, state labor and unemployment records, contracts with employers who provide unlawful employment or aid in unlawful employment of aliens and contact information for employers with those companies that the criminal organization uses to further its criminal activity. In my training and experience these records may be maintained electronically or in hard copy form. Electronic evidence may be stored on electronic storage devices, thumb drives, external drives, computer hard drives, desktop and/or laptop computers, cell phones, facsimile machines, in paper files, in locked safes, and in other similar locations commonly found in a residence or business under the control of the members of the criminal organization;

n. That it is a generally common practice for one or the other of the individuals who are part of large scale alien harboring, concealing, and transporting organizations and individuals who engage in laundering the proceeds of those organizations make use of wire transfers, cashier's checks, and money orders to pay for expenses associated with services to facilitate their illegal activities. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with alien harboring and concealment would also typically be maintained in the individual's residence, place of business, and/or other locations over which they maintain dominion and control;

o. That individuals who are part of large scale alien harboring, concealing, and transporting organizations often travel or pay and arrange for others to travel in furtherance of their illegal activities, including traveling to transport aliens and to transport currency derived from and/or related to the specified unlawful activities. Such

travel necessarily results in the generation of various travel documents for the traveler, which typically are also kept in their residences, places of businesses and/or their vehicles;

    p. That individuals involved in large-scale alien harboring, concealing, and transporting often keep the records and other items described above over long periods of time and may keep records in paper and/or electronic form; and

197.    That there is probable cause to believe that such items of evidence, which represent the fruits and instrumentalities of said offenses, will be located within the location specified in this application, which is located within the District of Nebraska.

**Request for Sealing**

198.    I further request that the Court order that all papers in support of this application, including the affidavit and corresponding search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

**Conclusion**

199.    Based on the facts set forth herein, I respectfully submit that probable cause exists to believe that violations of federal law, outlined above, have been committed by Ketankumar Babuhai Chaudhari, a/k/a "Ken," (Ken), Rashmi Ajit Samani, a/k/a Falguni Samani, (Rashmi), Amit Prahladbhai Chaudhari (Amit), Amit Babubhai Chaudhari a/k/a "Matt," (Matt), and Maheshkumar Amrutlal Chaudhari a/k/a "Mahesh" (Mahesh). I seek the issuance of an arrest warrant for all five individuals based on the complaint.

Respectfully submitted,

Rachel Sullivan
Special Agent
Federal Bureau of Investigation

Sworn to before me and signed via reliable electronic means

Date:   8/11/2025

JACQUELINE M. DELUCA
UNITED STATES MAGISTRATE JUDGE